## 7433

### *EX PARTE* TILLMAN.

1. PARENT AND CHILD.—Code, 1902, sections 2689-2690, relating to the right of the father to dispose of the custody of his children as now of force, enables him to extend whatever power of disposition the statute confers on him during his life.

2. IBID.—FAMILY.—AN AGREEMENT executed by husband and wife relating to the custody of their children while there was a breach of family ties, is annulled by a reconciliation and renewal of the united family life.

3. IBID.—CONSTITUTIONAL LAW.—If the provisions of the Code of 1902, sections 2689 and 2690, are to be so construed as to give the father, who has relinquished or forfeited his right to the custody of his children, the power to dispose of them to another without the consent of the mother and without judicial investigation into the case of the restraint, they would be in violation of the due process and equal protection clauses of the Constitution.

4. IBID.—HABEAS CORPUS—EQUITY.—Where a father forfeits or relinquishes his right to the custody, care and maintenance of his children,

the mother, under her family right, is entitled to their ·custody if competent, and she, the children or some one on their behalf, may obtain judicial·investigation of the cause of the illegal restraint by the father by *habeas corpus* or proceedings in equity.

5. Ibid.—Constitutional Law.—The legislative branch of the government by the constitutional provisions requiring the different departments to be kept forever separate and distinct is denied the power to authorize the father to grant the custody of his children to any person he may select and thus deprive the Court of the right, always recognized, to inquire into the custody of minors and their illegal restraint.

6. Ibid.—Ibid.—The Court will adopt such construction of a statute as makes it consistent with the Constitution, and so construing the statute in question, a deed made by a father disposing of the custody of his children is only binding on him.

7. Ibid.—Res Judicata.—Two girls of tender years in the custody of their paternal grandparents, under deed from the father, against the protest of the mother, there being nothing shown to justify the inference against the wife that she had forfeited her right to be with and care for her children, or that she was incompetent or unfit for maternal duties, are taken from the custody of the grandparents and given to the mother during their minority, or until it be otherwise adjudged. ·

Petition in the original jurisdiction of this Court by Lucy Dugas Tillman against B. R. Tillman and his wife Sarah S., *in re* the custody of Douschka Pickens Tillman and Sarah Stark Tillman, children of petitioner and B. R. Tillman, Jr.

*Messrs. McG. Simkins* and *DePass & DePass,* for petitioner.

*Mr. Simkins,* cites: *Degree of restraint necessary to authorize the writ:* Hurd on Habeas Corpus, 453 ; 15 Ency., 150, 185 ; 72 S. C., 23. *The deed in question is a nullity at present and takes effect at death of grantor:* Act 12, Chas. II; Ga. Stat., 1882, 2058 ; 19 Stat., 791 ; Code, 1902, 2689 ; 2690 ; 54 S. C., 388 ; 21 Ency., 15 ; Reeves Dorm. Rel., 390 ; 12 N. H., 437 ; Thomp. Dig., 225 ; 9 Fla., 295 ; 54 S. C., 393 ; 6 L. R. A., 675 ; 73 S. C., 302 ; 72 S. C., 23 ; 15 Ency., 23.

*When parent estopped:* 6 L. R. A., 675; 82 S. C., 336. *Right of parent to child is not a property right:* 54 S. C., 392; 6 Rich., 346; 10 Allen., 270; 54 S. C., 392. *Best interest of the child is paramount:* Hurd on Hab. Cor., 498, 461; 10 Allen, 270; 25 Ind., 495; 14 Tex., 81. *Right of mother:* 29 Ency., 1590-6. *Custody as between parent and grandparent:* 73 S. C., 353; 53 L. R. A., 784. *Here the custody of the mother is best for the child:* 54 S. C., 392; 6 Rich., 346; 11 Rich., 459; 2 Hill., 363; 72 S. C., 23; 73 S. C., 302; 9 L. R. A., 1173. *Father is estopped by his own declarations from asserting his claim:* 12 S. C., 351; 73 S. C., 303; 82 S. C., 338. *He having no claim, his grantees take nothing:* 9 Ency., 245. *If the construction contended for by respondents is placed on the statute it would then conflict with,* Art 1, sec. 5, Con. of this State, and sec. 1, art. 14; sec. 1, art. 13 of U. S. Con.

*Messrs. DePass & DePass,* cite: *Rule in awarding custody of children:* 76 S. C., 153; 82 S. C., 339. *Statutes relating thereto:* 12 Chas. 2, chap. 24; 21 Cyc., 13, 15; 4 Bacon's Abridgment, 538; 3 Stat., 708; 34 Breav., 266; 27 L. R. A., 56; 6 L. R. A., 672; 51 L. R. A., 843; 15 Ency., 188; 54 S. C., 393; 2 Am. St. R., 184. *Changes in the statute:* Gen. Stat., 1882, secs. 2058-61; 3 Stat., 708; 19 Stat., 791, Code, 1902, secs. 2689-93; 54 S. C., 391. *Respondents' construction of these statutes makes them in violation of art. 1, sec. 5 of Constitution, and art XIII and sec. 1 of art. XIV of Federal Constitution and deed of father takes effect in futuro:* 9 Fla., 295; 84 R. D. R., 390; 5 Brim., 520; 5 Clarke, 30; 1 Browne, 143; Allen, 270; 54 S. C., 392. *Former disposition of children by father renders later deed void:* 82 S. C., 336. *Petitioner entitled to children:* 6 Rich. L., 344; 11 Rich. L., 452; 72 S. C., 16; 73 S. C., 296; 82 S. C., 336. *Ex parte* Canova, 84 S. C.; Browne's Dom. Rel., 77; 54 S. C., 393; 73 S. C., 302; 2 Hill., 363; 40 L. R. A., 623; 67 L. R. A., 860; 16 L. R. A. 651; 53 L. R. A., 708;

5 Ore., 177; 48 N. Y., 348; 7 W. &. S., 401; 32 Pac., 315. *Contract set up by respondents is against public policy:* Greenwood Pub. Pol., 306; 40 Am. R., 321; 45 Am. Dec., 399; 16 N. J. L., 419; 38 Am. Dec., 644; 1 Joc., 251; L. R. 6 Ch. App., 705; 88 N. C., 31; 2 D. & J., 249; 43 Am. R., 768; 1 Ont., 388; Chambers' Inf., 59; Schanler Dom., Rel., 343; 17 Ency., 373; Pollock on Con., 304; 34 Conn., 258; 21 Conn., 543.

*Mr. J. Wm. Thurmond,* contra, cites: *The deed in question was executed in conformity to and by authority of the following statutes:* Code, 1902, 2689, 2690, 2691, 2692. *Construction of the statutes:* 72 S. C., 23; 82 S. C., 340; 54 S. C., 393. *Construction of similar statutes:* 13 L. R. A. (N. S.), 289; 24 Pac., 904; 4 Bro. P. C., 302; 21 Grant. C. H. (N. C.), 554; 18 Or., 461; 3 Cranch. C. C., 147; Fed. Case. No. 9312; 12 N. H., 437; 20 N. H., 284; 29 Am. Dec., 707; 1 Pitts B., 412; 27 Am. R., 400; 12 How. Prac. R., 515; 14 R. I., 63; 24 Hun., 370; 37 Cal., 662; 4 Ohio N. P., 1; 71 Md., 318; 42 S. E., 348. *Common law rights of father:* 5 Strob., 107; 6 Am. St. R., 682; 31 Am. St. R., 375; 6 Rich. Eq., 251.

February 15, 1910. The opinion of the Court was delivered by

MR. JUSTICE WOODS. Mrs. Lucy Dugas Tillman, the mother of the infants, Douschka Pickens Tillman and Sarah Stark Tillman, filed her petition in this Court on the 24th day of January, 1910, praying that a writ of *habeas corpus* be issued to the end that her children be released from the alleged unlawful restraint of the respondents, Hon. Benjamin R. Tillman and his wife, Mrs. S. S. Tillman, and that they be turned over to her custody, care and training. The petitioner alleges her marriage with B. R. Tillman, Jr., the son of respondents, the birth of the two children, one being now five and the other two years of age; the

intemperate habits of her husband, and such unjust and cruel attacks on her character by him that she was forced to leave him on November 23d, 1908; her subsequent reconciliation with him in February, 1909, on the faith of his retraction of the charge against her, and of his contrition and promise of reform; her husband's taking the children with her consent from the family residence in Washington for the purpose, as expressed to her, of having them visit their grandmother, Mrs. Sarah S. Tillman, who was then in Washington; the return of her husband in the afternoon of the same day without the children, his explanation being that he had given them to his father and mother who had taken them to South Carolina; her husband's departure from their residence immediately after making this statement, his taking with him his valise and his declaration of his intention to desert her; the execution of a deed by the father, B. R. Tillman, Jr., without her consent and without consultation with her, by which he undertook to transfer the custody and care of the children during their minority to his parents the respondents, B. R. Tillman, Sr., and Mrs. Sarah S. Tillman. The petitioner further alleges that she is fully qualified to have the custody and training of her children, and is possessed of ample means for their maintenance and education, and insists that under the facts stated she is entitled to their custody and care. On this petition, to which were attached numerous affidavits in support of its allegations, a writ of *habeas corpus* was issued requiring the respondents to bring the infants before the Court and show cause why they should not be released from their custody and committed to the custody of the petitioner. Thereafter, on the 31st day of January, the respondents brought the children before the Court and submitted their written return to the writ, by which they claimed the right to retain the custody of the children on these grounds:

First. That B. R. Tillman, Jr., the father of the children, executed to them on the 1st day of December, 1909, a deed

disposing of the custody and tuition of the children in accordance with the statute law of the State; and that they are suitable and proper persons to have their custody and tuition.

Second. That "at the common law the deed disposing of the custody and tuition of said children, being without prejudice to the children, would be good and valid during the lifetime of the said B. R. Tillman, Jr., and he being alive this proceeding is premature."

Third. That the disposition of the custody of the children by the father is for their best interests, and the Court for that reason should not deliver them to their mother.

The deed from the father, B. R. Tillman, Jr., to the respondents purports to dispose absolutely of the custody of the children during their minority, and the first inquiry is: does the statute law of the State authorize such disposition in the sense that it confers on the father the arbitrary power to dispose of his child, thus taking away the right of the mother and the child to judicial inquiry and adjudication as to their proper custody, and destroying the long recognized jurisdiction of the courts to adjudge the custody of minors according to established family rights. If the General Assembly has passed a constitutional act bestowing such absolute power on the father, the deed introduced is conclusive of the controversy.

The statute under which the deed was made is contained in the following sections of the Civil Code:

Section 2689. "The father of any child or children, under the age of twenty-one years and not married, whether born before or after the death of such father, or the mother of any such child or children, the father being dead, whether such father or mother be under the age of twenty-one years, or of full age, may, by his or her deed, executed and recorded according to law, or by his or her last will and testament, made and probated according to law, dispose of the custody and tuition of such child or children for and

during such time as he, she, or they respectively remain under the age of twenty-one years, to any person or persons, in possession or remainder.

Section 2690. "Such disposition of the custody of such child or children shall be good and effectual against all and every person or persons claiming the custody of such child or children, as guardian in socage or otherwise."

On behalf of the petitioner it is contended that the statute should be construed to confer on the father the right to dispose of the custody of his children only after his own death. This position is untenable. It is true that the statute of 12 Charles II, c. 24, adopted in this State without change in 1748 (3 Stat., 707), clearly limited such power to the disposal of the custody of his minor children, to take effect only at the time of his death. But this first statute was entirely repealed by the Revised Statutes of 1873, and a statute containing the sections above quoted (except the amendment of 1887, providing for disposition by deed or will by the mother, the father being dead), was enacted at the same time, not as an amendment, but as a separate statute. When so enacted it was placed under the general head, "Guardian and Ward," and under the subhead, "Minors." The words limiting the application of the law to the custody of the children after the death of the father were omitted from the new statute, and the omission clearly signifies the intention not to limit the power of disposition which it conferred on the father to custody after his death. The fact that the statute was placed in the Revised Codes of 1882, 1892, 1902, under the head, "Testamentary Guardians," might be regarded as significant of the intention if the case were one of doubtful construction; but the place assigned to a statute in the Civil Code cannot control the plain meaning expressed in the statute itself. It is, therefore, manifest that whatever power of disposition was conferred by the act on the father extended to the custody of his children during his life.

The next position taken on behalf of the petitioner is that the deed to the respondents could have no effect because there was a prior outstanding agreement between B. R. Tillman, Jr., and his wife, acquiesced in by the respondents, which provided that during the year, 1909, the husband and wife should alternately have the custody of the children. The argument is that the first agreement was binding on the husband and the respondents until it had been revoked by consent of the wife, or had expired by reason of its own limitation. The argument fails, because the first agreement was made in view of the then existing separation of the husband and wife, and there was afterward a reconciliation. Any agreement made in contemplation of broken family ties, and providing for the continuation of the breach, was annulled by the reconciliation and the renewal of the united family life.

This brings us to the inquiry, what is the extent of the power of disposition conferred on the father? Did the General Assembly intend to confer arbitrary power regardless of the rights and welfare of the children, and of the family rights of the mother? Or did it intend to confer upon the father the power to transfer only such rights as he himself had at the date of the deed, without infringing upon the rights of the children to be placed in the custody of their mother and the right of the mother to have their custody in case the father had by his conduct forfeited his right?

We think the proposition capable of demonstration that if the act is to be construed as conferring arbitrary power on the father it is violative of constitutional rights. The constitution of this State provides: "The privileges and immunities of citizens of this State and of the United States under this Constitution shall not be abridged, nor shall any person be deprived of life, liberty or property without due process of law, nor shall any person be deprived of the equal protection of the laws." Art. 1, sec. 5.

36—84

The liberty guaranteed in this section, and in the like provision of the fourteenth amendment of the Constitution of the United States, is thus defined by the Supreme Court of the United States, in *Allgeyer* v. *Louisiana,* 165 U. S., 578, 41 L. Ed. 832. "The liberty mentioned in that amendment means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper."

In the right of freedom from unlawful restraint is embraced the right to the enjoyment of all those privileges and immunities which belong to the citizen of a free country. These privileges and immunities are from their nature incapable of limitation by exact definition. For the purposes of this discussion, it is sufficient to say that they clearly embrace family rights, that is, the right of parents to the care and custody of their children, and the right of children to receive from their parents maintenance and care. But, beyond this, there is a liberty of children above the control of their parents which the courts of England and this country have always enforced. When the parent in asserting his claims to the custody of his child disregards the correlative right of the child to care and maintenance at his hands, it is universally held that the right of the parent is at an end, and the child for itself, or another on its behalf, may assert the custody and control of the parent to be an illegal restraint upon its liberty. This liberty of the child—the right to be free from such illegal restraint of the parent—the Constitution forbids to be taken away except by due process of law.

Within the protection of this provision of the Constitution falls also certain rights of the parents against each other

with respect to the custody of their children. The father being charged with the support of his children, ordinarily his right to their custody is superior to that of the mother, but when the father relinquishes his right to the custody or forfeits it by his conduct, there can be no doubt that the mother, under her family right, is entitled to the care and custody of her children. In other words, as soon as the father's right falls away, the mother's right immediately takes its place, and must be recognized by the courts unless it be relinquished or forfeited. The rights of the father and mother are both subject to the still higher right of the child to have its welfare safeguarded. It seems perfectly clear that the General Assembly cannot empower the father at his own will to deprive the mother and child of these legal rights so long established as elements of personal liberty.

If these family rights of the mother and children were not held to be within the protection of the Constitution, under statutes like this, the father could exercise a tyranny revolting to all sense of justice and conceptions of personal liberty. He could at any moment capriciously break up his family, take all his infant children from their mother without her consent, and bestow them upon strangers; and the courts would be powerless to give any relief, though manifestly such a course of conduct would itself be plenary proof of relinquishment of the duties of the parental office.

The argument comes to this: The guaranty of personal liberty expressed in the Constitution means, above all else, that no human being under the protection of the Constitution can be placed under subjection to the arbitrary power of disposition and control of any other human being.

True, it has often been held that the legislature may, by statute, empower a guardian to sell the property of his ward without legal process, but this can be done only for a purpose connected with the convenience or necessity of the child as the owner. It is too obvious for discussion that a valid leg-

islative enactment could not be made that a guardian or a
parent should determine the right of property when he had
set up a claim adverse to the minor.   So likewise the legis-
lature cannot provide that the father shall make final dis-
position of the child's custody and thus settle an issue con-
tested with him in his own favor.

When such arbitrary power is asserted under a legislative
act or otherwise, the person aggrieved is entitled to judicial
inquiry into the cause of the detention.   After setting out
the rights of parents as to the custody and restraint of chil-
dren, and the restraints incident to some other legal rela-
tions, Judge Cooley says: "These, then, are the legal
restraints upon personal liberty.   For any other restraint,
or for any abuse of the legal rights which have been speci-
fied, the party restrained is entitled to immediate process
from the courts and to speedy relief."   Cooley Con. Lim.,
422.

Without pausing to apply the comprehensive definition of
due process of law laid down in *Turpin* v. *Lemon,* 187 U. S.,
51, 47 L. Ed., 70, it is sufficient to say here that it is univer-
sally understood that on the issue of custody—deprivation
of liberty, or illegal restraint of children—due process of
law requires judicial investigation and determination of the
rights of parents and children under a writ of *habeas corpus*
or by an appropriate proceeding in the Court of equity.
*Prather* v. *Prather,* 4 DeS., 33; *ex parte Schumpert,* 6 Rich.,
346; *ex parte Hewitt,* 11 Rich., 326; *ex parte Williams,* 11
Rich., 452; *ex parte Reed,* 19 S. C., 604; *Anderson* v. *Young*
54 S. C., 388, 32 S. E., 448, 44 L. R. A., 277; *ex parte
Davidge,* 72 S. C., 16, 51 S. E., 269; *ex parte Reynolds,* 73
S. C., 296, 53 S. E., 490; *Brown* v. *Robertson,* 76 S. C., 151,
56 S. E., 786, 9 L. R. A. (N. S.), 1173n; *ex parte Rembert,*
82 S. C., 336.

There is another provision of the Constitution fatal to the
statute regarded as an attempt to confer upon the father
arbitrary power to grant the custody of his children to any

person he may select. The Constitution requires that the legislative, executive and judicial departments of the government shall be forever separate and distinct from each other. Art. 1, sec. 14. The same provision was in the Constitution in force when the statute under consideration was passed. The question of the custody of minors and their illegal restraint has always been recognized as a judicial question to be determined by the courts. Pomeroy's Equity, sec. 1304. That it is the function of the courts to decide issues of this kind has been held in this State by unbroken authority from the case of *Prather* v. *Prather,* 4 DeS., 33, to *ex parte Rembert,* 82 S. C., 336. The legislative branch of the government is denied the power to exercise this judicial function or to confer on a father or other person the right to exercise it. In accordance with this view, it was held in *Ware Shoals Mfg. Co.* v. *Jones,* 78 S. C., 211, that the General Assembly could not take away the power of the Court to enjoin a threatened irreparable injury to private property, unless it provided some other adequate judicial remedy.

From these considerations it follows that if the act under consideration be construed as an attempt to give the father the absolute right to dispose of the custody of his children by deed or will, it must be held unconstitutional.

But if there is a different construction of the statute which can be reasonably given not inconsistent with the Constitution, it is the duty of the Court to adopt it, although it may be the less natural construction; for it is always presumed that the legislature intends a satute to have meaning and effect consistent with the Constitution. *Ex parte Graham,* 13 Rich., 277; *Hayes* v. *Clinkscales,* 9 S. C., 44; Cooley Con. Lim., 223; 26 Am. & Eng., Enc., 694. We think such a construction may be given in this instance. While the father cannot be empowered to convey away the rights of the children or of the mother with respect to their custody, there is no reason why the General Assembly may

not provide that his deed should be binding on him. The result of this construction of the act would be to give effect as against the father himself to any deed made by him in accordance with the statute, so that after he had made such a deed he could not as against the grantee demand back the custody which he had voluntarily relinquished. Accordingly the validity of the statute to this extent was recognized in *ex parte Davidge*, 72 S. C., 23, 51 S. E., 269 ; and *ex parte Reynolds*, 73 S. C., 296, 53 S. E., 490.

The conclusion follows that the rights of the children and their mother, the petitioner, are unaffected by the deed from B. R. Tillman, Jr., to the respondents ; and hence the duty devolves on the Court to determine whether the custody of the children should be awarded to the petitioner, their mother, or to the respondents, their grandparents.

No claim is made by the father to the custody of his children. On the contrary, in his deed to the respondents he expressly states, as one of the reasons for making it, that he does not wish to undertake the responsibilities of rearing them. The issue then is between the petitioner in the maternal right and the paternal grandfather and grandmother, claiming under a deed from the father, and alleging the mother to be unfit to be entrusted with the rearing of the children. In the decision of this issue the Court should give great, if not conclusive force, to the wishes of the father expressed in the deed entrusting the custody of his children to another fitted to rear them, if the family relation was broken, not by his own fault, but by the fault or incompetence of the mother. On the other hand, if the family relation was broken by the act of the father in taking the children from the mother and bestowing them on the respondents against her protest, when there was not on her part such improper conduct or incompetency as to constitute a just reason for such extreme action, then the taking away of the children and the execution of the deed could not be

regarded other than acts in themselves so violative of the father's obligation to both mother and children as to call for the interference of the Court on their behalf.

This, we think, presents the ultimate issue in the controversy. The version of the petitioner has been already set out. The respondents in their return make the general charges that the petitioner has always been direspectful towards her husband and implacable in her dislike of his family, and they show that this dislike extended to unbecoming expressions of her antipathy in a letter to her husband. They express the opinion that the former intemperate habits of the husband were due to his unhappy marriage. In support of their claim that the deed was justified, and that they should retain the custody of the children, they introduced an affidavit of B. R. Tillman, Jr., intended to show the petitioner's unfitness to have charge of her children. In this affidavit B. R. Tillman, Jr., admits the faults attributed to him by his wife, their separation, his own contrition and their subsequent reconciliation, averring, however, that he has entirely given up the use of intoxicants. He says that he was constrained to give the custody of his children to his father and mother because of the unfitness of his wife to rear them, in that she was selfish, had taught his children to hate his family, was arrogant towards him, showing a disposition to consider him and his family beneath her, and in that she had very little education and "she had expressed ideas upon the most sacred relations of life which were absolutely contrary to the best interests of any home, and under which no child could be properly raised." He further avers that he sent the children away with his mother after his wife had angrily refused permission that they should go and remain until she had recovered her strength after the illness from which she was then suffering. His account of the separation conflicts with that of the petitioner in that he avers that after he had sent the children away without her consent, she left their apartments and refused to communi-

cate with him until the children should be returned. He admits that he made the deed attempting to permanently deprive her of them against her bitter opposition.

Most of the matters alleged against the petitioner rest on opinion. A mother's lack of education and her faults of disposition, even though they be somewhat trying and unusual, do not warrant the father in wresting her children from her. Little can be inferred from the antagonism between the wife and the relatives of the husband. Such antipathy often results from lack of congeniality and difference in aspirations and ideals, when on both sides there is real goodness and worth. The petitioner has not shown herself to be faultless; but it is certainly no favor to her and no wrong to her husband or the respondents to judge of her fitness to have the custody of her children by the letters of her husband written a few days before the children were carried away. In these letters, running from November 2d, 1909, to November 9th, 1909, he expresses the deepest affection for her, uttering no complaint against her, but blaming himself for their past differences, and telling her that his love for her is redeeming him. He writes of attending to her business affairs in Edgefield, and sending silver and furniture for family use in Washington; thus indicating his intention to maintain his home with her and the children. We are unable to find evidence of anything done by the petitioner after these letters were written warranting a change in her husband's estimate of her. In consonance with these letters of her husband, scores of the petitioner's neighbors and associates, who were qualified to judge, submit affidavits to the effect that she is a woman of high character and eminently qualified in all respects to rear and maintain her children.

We shall not undertake to pass on the differences between the statements of the husband and wife of the trouble which led to the separation. We think there can be no doubt that the husband brought it on by sending the children away, and that there was nothing in the conduct of the wife justi-

fying the inference that she had forfeited her right to be with and care for her children, or showing her to be incompetent or unfit for maternal duties. Her right to the privilege of having her children is greatly strengthened by the fact that the children are girls of very tender years. Even in an issue between the father and mother the Court will usually grant such children to the custody of the mother, unless there are strong reasons against doing so. *Ex parte Hewitt, supra.*

It is also an important consideration that while the respondents would no doubt care for these children with intelligence and tender solicitude, they are somewhat advanced in years and probably will not live to see the children reach maturity. More important still is the consideration that the children in the care of the mother may touch and soften the hearts of both husband and wife, quicken in both the sense of love and duty, and bring about a reconciliation and a renewal of family life. With respect to the apprehension expressed that by divorce or marriage or otherwise the welfare of the children may be imperilled in the future, it is to be observed that the judgment now rendered does not prevent this or any other Court of competent jurisdiction in this State, or elsewhere, from changing the custody of the children, upon proof of such material change of conditions as to make such a step proper.

The conclusion of this Court is, that the children, Douschka Pickens Tillman and Sarah Stark Tillman, are in the unlawful custody of the respondents, B. R. Tillman, Sr., and his wife, Mrs. Sarah S. Tillman, and that the petitioner, Mrs. Lucy Dugas Tillman, is entitled to their custody.

It is, therefore, ordered and adjudged that the respondents, B. R. Tillman, Sr., and his wife, Mrs. S. S. Tillman, deliver up the children to the petitioner, Mrs. Lucy Dugas Tillman, and that she have and retain the custody of them during their minority or until it be otherwise adjudged.