21110

George Wilson McPHAIL, Respondent, v. Clarice Bacote McPhail HAIRELL and Annie A. Bacote, Appellants.

(262 S. E. (2d) 411)

*John P. Gardner* of *Gardner & Gardner,* Darlington, *for appellants.*

*Daniel B. Causey, III,* Darlington, *for respondent.*

January 8, 1980.

GREGORY, Justice:

This is a child custody dispute. Appellants Hairell (mother) and Bacote (maternal grandmother) appeal an order of the Family Court awarding custody of three minor children to respondent McPhail (father).

We reverse.

By order of January 19, 1977, the lower court removed the children from the father's custody, awarded temporary custody to the mother, and denied the father visitation privileges. The order was issued as a result of a report to the court from the Department of Social Services acknowledging evidence that two of the children had been physically abused while away from the mother, and similar complaints advanced by the mother that the father had severely beaten the children.

Shortly thereafter, the father petitioned the court for reinstatement of custody.

Although the pleadings were not made a part of the record, the order appealed from indicates the grandmother petitioned the court after the commencement of the proceedings to be substituted as respondent, seeking custody in place of the children's natural mother. The court granted the grandmother's request. Accordingly, the Family Court judge treated the custody dispute as one between the maternal grandmother and the father.

Several hearings, including an in-camera interview with the children, were had on the merits of the child abuse charge and the parties' respective requests for custody. On June 8, 1978, the lower court awarded the father custody of the children.

We find the weight of the evidence to be so overwhelmingly against reinstating the children with the father as to constitute an abuse of discretion requiring reversal.

The gravamen of appellant's case is the testimony of Dr. James McInnis, a family physician who had seen the children on several occasions at the request of the mother. A history of physical abuse by the father was noted on each occasion.

The following excerpts from direct examination of Dr. McInnis and further examination by the court are illustrative:

"A. A physical examination at that time revealed multiple bruises and welts about his back and legs, both front and back portion of the legs, down his back and along his waist and sides. They were made with some relatively firm object.

\* \* \*

"Q. Will you describe the severity of these injuries, whether they are in the context of normal chastisement of parental punishment?

"A. There were very few places on the child's back or legs, either one of them, that you could find that did not have evidence that he had been hit there, with a very firm object. It could have been a belt, it could have been a stick.

\* \* \*

"A. I cannot conceive by my wildest imagination that this type of punishment is necessary . . .

"Q. Dr. McInnis, can you conceive by your wildest imagination that these injuries are not a result of punishment? Is there any possible explanation,

"A. No, sir, they encompass the legs, for instance, except just on the inner aspects. They came around the flank area to the back. This required beating from several different, blows from several different angles. That doesn't happen with a fall.

\* \* \*

"Q. Did these symptoms that you saw indicate beatings that could have been dangerous to the life and health of these children?

"A. Yes, sir."

\* \* \*

At the hearings, the father did not deny having beaten the children, but asserted that the children's conduct justified the punishment inflicted. The lower court agreed.

In our view, in order to find that the father was justified in the action taken, the lower court would have had to either ignore the testimony of Dr. McInnis or attribute such inappreciable weight to it that the evidence would have little credibility.

The order of the lower court reflected a finding that "the home being offered by [the mother and grandmother] contains an atmosphere of love, affection, and in general presents a wholesome siutation. . ." And further,

"The Court . . . finds as a matter of fact that both the petitioner and the mother as well as the grandmother love the children and are endeared to the children and that regardless of which party has the custody the others should be allowed reasonable visitations. The evidence reveals that [the grandmother] is an usually (sic) fine person who has exposed the children to an atmosphere of love and peace and in general to a wholesome situation. The Court cannot overlook, however, the right of a child to have a parental home. . . ."

In addition, the record reflects the grandmother has provided the central home environment for these children since the parents' separation in 1972 and subsequent divorce. At the time the divorce was granted, the three children were ages seven, three and two respctively. The father remarried in August of 1974. While both the father and mother have enjoyed periods of separate legal custody, the grandmother has supplied a home and actual custody intermittently, yet substantially, throughout the formative years.

While we have recognized that a natural parent should be given some preference in disputes over custody, this presumption must nevertheless evaporate when it conflicts with the best interest of the children. *Skinner v. King,* 272 S. C. 520, 252 S. E. (2d) 891 (1979); *Cook v. Cobb,* 271 S. C. 136, 245 S. E. (2d) 612 (1978).

In our view, the welfare and best interest of the children, which the court and the state, as *parens patriae,* have the duty to protect, mandate a reversal of the order of the lower court. *Cook, supra; Skinner, supra.*

Reversed.

LEWIS, C. J., LITTLEJOHN and NESS, JJ., and JOSEPH R. Moss, Acting Associate Justice, concur.